Secretary of State will let these lawyers, if they wish to do so, leave and take anybody with them that want to, and then we'll start the Greater Birmingham Ministries. Yeah, where's my pronunciation guide? Okay, I got you. I thought that it was a different page. Thank you. Okay. Okay, Mr. Ross. May it please the Court. My name is Duell Ross. On behalf of the plaintiffs, I will be addressing the Section 2 claims. I'm also prepared to answer questions about the voucher test claim. My colleague, Ms. Murrell, will address the District Court's failure to fully consider our constitutional claim. Section 2 cases are fact-intensive and therefore rarely suitable for dismissal at summary judgment. This case is no exception. Yet the District Court improperly weighed evidence and resolved disputed facts in favor of the Secretary of State about HB 19's discriminatory results. For example, the evidence showed that African American voters and Latino voters were disproportionately more likely to both lack access to vehicles and lack access to, excuse me, to live over 5 miles away from an ID issuing office. The District Court dismissed these burdens, however, based solely on the Secretary of State's mobile units and home visits. The nature of whether or not these home visits and mobile units were sufficient or not is exactly the kind of issue that needs to be resolved after a trial. Plaintiffs presented evidence that essentially went to whether or not these mobile units were, in fact, sufficient. Plaintiffs showed that African American voters, well, excuse me, there are at least three sort of errors that we think the District Court made. First, they sort of, the Court ignored all the burdens that we had demonstrated. Second, the Court created, didn't fully consider issues around whether or not African American voters face a disparate impact in terms of the Senate factors, in terms of turnout evidence. The Senate factors are far, far more appropriate for vote dilution cases, are they not? Well, Your Honor, in Burton v. City of Belle Glade, this Court already ruled that the Senate factors are also appropriate for vote denial cases. Yeah, but most of them don't, I mean, they don't even make sense trying to apply it to vote denial. Well, we think that Senate Factor 1, Senate Factor 3, Senate Factor 5, Senate Factor 9, all of those in this case are particularly suitable. The first Senate factor goes to the history of racial discrimination. The fifth Senate factor goes to whether or not there's a history of racial discrimination in Alabama society that has led African Americans to disproportionately lack acceptable ID. And the ninth Senate factor goes to the tenuousness of this requirement. Well, I mean, how can it be tenuous when the Supreme Court of the United States says it's an important interest of every state? Well, Your Honor, in this case, we obviously have our constitutional claim, so we've presented evidence that— I know, but you're skipping past my question. If you're using the Gingell's factors— Yes, Your Honor. And the Supreme Court of the United States has said you don't have to have any evidence of voter fraud. Every state has a vital interest. Yes. How can you say the ninth, Gingell factors, that the interest the state is seeking to further is tenuous, applies in this case? I don't understand that. Well, Your Honor, to answer your question, the issue in this case is a Section 2 violation. In Crawford, the Supreme Court was dealing only with whether or not voters face a burden— Whatever it was dealing with, the Supreme Court says every state has a vital interest in preventing vote fraud. Every state. And you don't have to put in evidence saying that. Yes. How we can hold that the state's interest in preventing vote fraud is tenuous. Well, I think, Your Honor, that goes to—that's one Senate factor. As you know, there are nine— Okay, so let's don't push the peripheral points. You've got stronger points. Let me ask you one thing, because this was in the red brief. I didn't see anything in the gray brief responding to it, albeit it is in a footnote. Footnote 10 on page 19 of the red brief says, nothing in the record shows that a single Alabama voter has ever been unable to vote because information on the ID does not match the name in a voter registration database. Is that correct? No evidence? Your Honor, there was some testimony from advocacy groups that they had had issue with Latino voters whose names didn't match the ID. That they had found some that didn't match, but as I understood the state— Yes, Your Honor. That was something that concerned me about the matching because there's so many variations in names. First name versus middle name, first and middle, et cetera. But they say nothing in the record shows that a single Alabama voter has ever been unable to vote because information on the ID does not match the name in the voter registration database. Not that there's not some discrepancy. Yes, Your Honor. But there's no evidence of the non-movement that anybody was ever denied a vote because of that. Related to the name discrepancies only? Yes, Your Honor. So I referenced that there was testimony that people had worked with voters who potentially had issues with those name discrepancies, but standing up here, I can't think of any. Okay, that's fair enough. Your Honors, I'll cede the rest of my time for now to Ms. Murrell. All right, you've got five on the clock. Yes. Ms. Murrell. Good morning, Your Honor. My name is Natasha Murrell on behalf of plaintiffs. Whether the legislature intended to discriminate when enacting HB 19 is a classic question of fact that is not suited for summary judgment. On pages 42 through 45 of the district court's opinion, it lists the material facts that show that the legislature enacted HB 19 at least in part to depress the growing black and Latino vote. Yet, the district court improperly ignored this evidence of discriminatory intent based on speculation that the law had no disparate impact. That is not ground for summary judgment and the plaintiff's request that this court remand our constitutional claim for trial. Here, there are material disputed facts and inferences. Excuse me, how would that factual issue? I've always wondered when we talk about legislative intent. And, you know, there's been so much conversation about the Supreme Court. How does the legislature have one intent? I don't understand. I forget, a hundred and I can't even remember the number of representatives there are in the Alabama House. Let's say there are 105. How do you show what 105 people intended? So, in the record, we have evidence of the sponsors and their intent that goes to discrimination. And this court has held installings that when there is evidence that some of the sponsors of the bill were motivated by intentional discrimination, that the fact that other sponsors were not motivated by discrimination does not matter. And here, we have. You know, I don't. If that's law, that's law. But I don't understand how the sponsor's intent is the intent of the entire legislature. Is the thought that if you didn't have sponsors, you wouldn't have legislation and, therefore, it's a but-for cause? Is that? I'm trying to follow this out. I don't understand how you get to a collective intent from comments or thoughts or even an affidavit. Let's say one person said the reason I supported this bill was I had racially discriminatory intent. What about the other 104? So, also, it's important to remember that we're here on Rule 56. Plaintiffs have put in evidence that the sponsors were motivated by intentional discrimination, and this evidence is sufficient to create a triable issue that the district court should have looked at at trial. Furthermore, another point is that this legislature, in total, passed other laws that also were found to have violated federal law. The same legislature that passed HB19 passed two reapportionment bills that unconstitutionally segregated black voters into districts, and it also passed HB56, which the secretary's own expert said discriminatorily targeted Latinos and was indefensible. So, given that the legislature had passed other discriminatory laws and given that the sponsors, we have evidence of their intent, that is from which a court, there's a material dispute as to what the intent was. The district court here decided this case at summary judgment. What were the disputed issues of material fact which should have, or in your estimate, should have precluded the entry of summary judgment? So, we presented, there's evidence in the record that goes to each of the Arlington Heights factors, which are material facts that are disputed and inferences that are disputed. I can focus on three. First, there's statements of the sponsors, which I have already alluded to, statements of discriminatory intent from which we posit the court could have found that they intended to discriminate. The other laws that I also mentioned. Furthermore, we have put into evidence a 125-page expert report, which is at appendix 4, 252-9, in which our expert goes through the history leading to the passage of HB19 and in the passage for the 15 years, the white legislators after the passage of the NVRA and the rising black voter registration attempted to pass a voter ID bill, and this struggle for 15 years is permeated by race. We also put into evidence that the legislature procedurally departed from the legislative process when passing HB19 and that as Senator Sanders testified, they invoked closure, limited debate for 20 minutes, and then the proponents, the senators, held the microphone so that the bill could not be debated. These facts and inferences are all in dispute, and it's those facts that should have gone to trial to determine what the motive of the legislature was. Those seem to go to intent, but what were the disputed issues of fact regarding the effect of the law? So there are, we put into evidence that the law, that the law, that the black and Latino voters are twice as likely to lack the required voter ID, and as you know, it's required by the Arlington Heights factors. The question is whether the law bears more heavily on black. But that doesn't mean that they would have voted had the, had the voter ID requirement not been in effect. The question we, or at least I was probing for is, what evidence is there that someone who would have voted didn't vote because of this requirement? Well, we have in the record evidence of the provisional ballots and that, which means that voters went to vote on Election Day, had to cast provisional ballots, and that their ballots were denied because they lacked ID, and there is evidence in the record that black and— When you say their ballots were denied, if they cast provisional ballots, they weren't denied. Their ballots were— They were provisional. I thought, and maybe I'm wrong, I thought that what Alabama did was you count the non-provisional ballots, and if the provisional ones don't make any difference, end of the question. Am I wrong about that? So we have in the record that if you do not have a photo ID, you're required to cast a provisional ballot. You have three days to perfect that ballot by coming to the office and showing a photo ID, and we have in the record that provisional ballots were not counted and that they were disproportionately black voters, black and Latino voters whose provisional ballots were not counted because they did not have a photo ID. How did the steps that Alabama has taken, you can come in and get a photo ID, you can go to a mobile unit or you can have a home visit, how do those steps not take care of making it so that everybody in Alabama can get a photo ID? I think as Mr. Ross was alluding to, that's a question of fact that we have posited that the efficacy of the mobile van unit, the efficacy of the home visits, that is a question of fact that there's evidence in the record that it's contested. What is the question of fact about the efficacy of the home visit? For example, we have presented evidence that there have only been five home visits since the Secretary began to provide these home visits. This home visit is not an actual program, it's an ad hoc basis. What is your evidence that one was requested and not done? We have evidence in the record that, for example, one voter had to call his state representative and that state representative had to call the Secretary a number of times before they were able to get a home visit. Do you have any evidence in the record that somebody wanted a home visit and could not, did not get one? I don't believe that is in the record. But I think also it just goes to the fact that there are, you know, at least 100,000 voters without photo ID and yet the Secretary has only been able to provide five home visits. It's a question of fact that's the efficacy of this program. Well, I think we would all agree. Georgia has just gone through an election. Not everybody votes. In fact, it's a small percentage. So simply the fact that there are a number of people in Alabama who don't have IDs and only five home visits, I don't see the correlation that therefore they're missing, you know, the rest of the population. If they haven't been requested, I don't know how relevant that is. And I guess what we're trying to get at is Alabama has taken a lot of, what more could Alabama do to ensure that voter IDs are made available to everybody in Alabama? I mean, mobile units, home visits, go to the centers. What could Alabama do to make this program okay under your argument? I think to go into your original question, Judge Brant, about what the only five home visit means, I think that's a question of fact that should have gone to trial. Whether the Secretary is claiming that this is sufficient and effective, we have put forth evidence that it is not. That is a question of fact that we think requires at this stage a trial. Let me ask you this, and I apologize for my fascination with the concept of a unified or chargeably unified intent on behalf of the legislature. Let's suppose in this case it was stipulated that this law was enacted for impermissible reasons, racial discrimination, and we struck it down. And then the next legislature comes in, and they're never the same. One of the 105 in the House or more are out. New ones are in. Some get indicted. In the Senate, 35 folks, they're not all the same. They come in a new legislature after the elections, and they enact the same law and say, we're sorry about that other bunch of clowns, but we're doing this for the same reason that the Supreme Court held it was okay for the State of Indiana, Illinois, whatever it was, enacted one. We do not have a discriminatory intent at all. Is that okay? Does that second statute get tainted by the collective or sponsor intent of the original? Different sponsors. The sponsors from the first legislature vote doesn't make any difference at all. They're no longer sponsors. Is that okay? Or is it forever? Once you have somebody in one legislature with a bad intent, you can never enact a statute that everybody agrees, or at least that I would hold, is permissible if you don't have an improper intent. No, we're not saying that the photo ID bill, if passed by a new legislature, would necessarily be motivated by intentional discrimination. But what would be required is to go through the Arlington Heights factors, as we have gone through here, to see the motive of that legislature. That is what is required. If that legislature didn't enact any redistricting provisions that were struck down and you didn't have the remarks that were brought out in the trial, the racetrack trial, et cetera, that's okay then? If this same legislation were enacted by a legislature, let's say 100 percent African American legislature enacts this legislation and there's not the slightest indication of any racially improper intent, this would be a constitutional legislation, would it not? Yes. Under your example, where there's none of the Arlington Heights factors and this law is enacted anew, I think we would concede that there may not be a constitutional violation. No, you can't say may not be. Of course there may not be and there may be. What I'm saying is this legislation itself is constitutionally permissible under the prevailing Supreme Court decision and the weight of authority from other circuits. Your case rises or falls on the racially discriminatory intent of the legislature, does it not? Yes. Okay, all right. That's helpful to me. I appreciate that. Then Mr. Davis. Thank you, Your Honor. Mr. Davis, we took them over five minutes so we'll give you an extra five as well. Thank you, Judge. Thank you, Chief Judge Carnes and may it please the Court. I'm Jim Davis arguing for Secretary Merrill. The undisputed evidence in this case shows that any voter in Alabama who needs a photo ID can get one, even if they have no birth certificate and even if they have no access to transportation. Getting an ID is just as easy for minority voters as it is for white voters and no one has any less opportunity than anyone else to participate in the political process as a result of this law and certainly not on account of race. So we urge the Court to affirm the district court. Aren't there some statistics to the contrary? I mean, you're saying that all things are equal, but there was some statistical evidence that suggested that there was a difference based on race. If you're speaking of the rates of possession, Judge Gale, there is some statistical evidence that blacks and whites may have different rates of possessions of IDs at any moment. But it's our position that that doesn't matter, that that's not material to the claim. What matters is whether those people who may not have an ID today, whether they can easily get one. On the Section 2 claim, Section 2 is only violated if a practice or procedure affects someone's ability to participate in the political process. And if someone without an ID can get one very easily, then they're not prevented from voting, their rights not abridged, they can easily participate in the political process on the same grounds as everybody else. We would have a different case if, say, as in the original incarnation of Texas's law, there there was evidence that some people were having to drive over 100 miles to get an ID. Here, you only have to go to the Board of Registrar's office. There's one in every county, and you don't even have to do that. For voters who are unable to do that, the home visit program is available. And Judge Grant, you ask about the home visits. We don't think there's any dispute of facts about the home visits. It's true that there have only been five, at least at the time of summary judgment, but there have only been five requests. And this person whose state legislator called Secretary Merrill, this was a voter who was exempt from the photo ID law. That was a voter who was disabled. And when he called to talk about home IDs, it was explained to that voter that he did not need a photo ID for voting because of his disability and an exemption under the law to the photo ID requirement. He wanted one anyway, and the Secretary of State sent someone to his home and provided one to him. And that is available for any voter, any voter who needs it. Any voter who's unable to get to the Board of Registrar's office, Secretary Merrill will go to their home. Well, what about the issue that was raised on the provisional ballots? So this is where a time constraint comes into play. Somebody walks in on election day to vote, doesn't have the ID, casts a provisional ballot, and now the clock starts ticking as to you have a certain period of time to get a photo ID or your vote is not going to be counted. So let's talk about that's a, you know, before the election, you have time to do this. But if someone says, okay, I'm going to need a home visit, how can all of this be accomplished before the clock runs out? I think it could be difficult to schedule a home visit in a three-day period. I think it is incumbent upon voters to do some planning. And I think this reasonable requirement, when we've made it so easy and we've offered to go into their living room to provide the photo ID, if a voter goes to the polls without a photo ID, yes, they can cast a provisional ballot. They have until I think the Friday after election to get a photo ID and cure it. If they can get to the Registrar's office, they can get a temporary ID immediately and thereby cure the provisional ballot. But the evidence in this case about provisional ballots, there is some evidence that some provisional ballots were not cured. Now, the reason a person may vote provisionally, it could be that that person has no ID at all. It could be that I show up at the polls and I left my wallet at home. I have an ID, I just don't have it with me at the polls. At that point, I've got three days to cure it. And if I don't cure it, there could be a lot of reasons for that. Maybe I see that my candidate won by 20 points or lost by 20 points. Why at that point am I going to go to the Registrar's office to cure the provisional ballot if I think the vote doesn't matter? So there's no evidence in the record as to why someone voted provisionally or why they may not have cured it. I thought the Alabama law election procedure were that on contested ballots. Now, that may be a different category than I suspect it is. They don't even count those unless the number of them exceeds the margin of difference. Am I wrong about that? Judge, I'm not sure. That hasn't come up in this case. My understanding of the data that was at issue in this case were when provisional ballots were counted but some of those were not cured. And what we don't know is the reason why they were not cured. When you say they were counted, do you mean they were put in the tally? Yes. The ones, the provisional ballots that were cured were counted. The ones that were not cured, of course, were not counted. And we do not know why those ballots were not cured. In this case, the district judge decided the case at summary judgment and the court skipped over the first prong of this two-prong analysis. It skipped over intent and went straight to effect. Isn't that a bit unusual in this kind of case that a case would be decided at summary judgment? I mean, in fact, the court cited a case, Frank v. Walker, from the Seventh Circuit. Frank involved a trial where it considered testimony. Why wasn't that the appropriate way to proceed here? Well, Judge, we believe we were entitled to summary judgment and that we showed it. I don't think it's unusual in an area of the law for there to be, you know, a few cases where you have bench trials or even jury trials. You settle some legal issues, and at that point, the law becomes a little more settled, and then summary judgment becomes more appropriate. We agree completely that it's rare when a case of this sort— Well, not only that, but in this case, I mean, are you disputing that there— well, presumably so since you filed a motion for summary judgment. I mean, there were some, at least as the plaintiffs contended, disputed issues of material fact. Plaintiffs do contend. We agree there are disputes of fact. We do not agree that those are material or genuine, Judge. Now, what about the statistical evidence? And I know that there was some dispute among the experts in the case about what those statistics were and what they meant, but regarding the acceptable ID possession rate, as I understood it, the parties kind of agreed that black and Latino registered voters were almost twice as likely as white voters in Alabama to lack an acceptable photo ID. First of all, is that correct? We don't know if that's correct, but on summary judgment, I think, yes, this Court should presume that Dr. Siskin's expert report is correct and that there may be—he found that possession rates are about 98.33 percent, that there was some discrepancy in possession rates, about a 1 percent difference between the races. And this Court in Underwood v. Hunter found that there was less of a disparity and found that that was sufficient evidence of discrimination. So here you have a greater percentage. Why wasn't that something that would have been sufficient for the Court to find a genuine issue of material fact to at least handle it at trial? We contend, Judge Gales, that was a different kind of disparity in Hunter v. Underwood. Those were people who had lost their right to vote on account of felony convictions. Some voters were disenfranchised. Here, this discrepancy is about people who may not have an ID at any given moment, not whether their right to vote has been impacted. There can still be— But now you're trying to separate having the required ID to vote from actually voting. I mean, they're connected in this case, aren't they? They're related, but they are different because a voter who doesn't have an ID today, if you can get one so easily, if we will go and take your picture while you're on your couch, then your right to vote isn't impacted. So we think, Judge, that the district court was correct on the intent claim to say, wait a minute. This doesn't hurt anyone's right to vote. I don't have to go through all this other evidence. Well, wait. The judge didn't analyze the intent, though, correct? Correct. He determined that the law does not discriminate, and when there's no discrimination, there cannot be intentional discrimination. And there's no discrimination when it comes to a person's ability to cast a ballot, not when it's so easy to get an ID. The judge said in his order, before the Voting Rights Act was passed, Alabama and other states used literary tests, poll taxes, and good morals requirements to discriminate against minorities. In some cases, voters were not permitted to cast a ballot unless they got a voucher from one or more other voters, et cetera. That came later in the order, not in an analysis regarding intent. How could a judge, with all due respect to the great state of Alabama, knowing the history of voting in that state and the timing of this law after that section of the Voting Rights Act was eliminated, not even discuss intent? Now, the conclusions may have been the same ultimately, but to find that there wasn't even worthy of discussion, that seems a bit odd. Judge Cooper did not tell us why he did not say more about intent except for the fact that he found there was no discrimination and that, in his view, without discrimination, there cannot be intentional discrimination. We think he was correct about that. We do think he knows, too, that Alabama is not the Alabama that had the literacy test. I'm not suggesting that it is. What I am perhaps suggesting is maybe these were issues in dispute for which the court should have had a trial as opposed to resolving this at summary judgment. I don't know how judge—it's not in dispute that these things happened in the 60s. It's not in dispute that the legislature passed the immigration bill. It's not in dispute that we passed the redistricting bill. It's not in dispute that members of the legislature made some very racially charged statements contemporaneous to this law being passed, right? It's not disputed that Senator Beeson, former Senator Beeson, one out of 140 said some shameful things unrelated to this law. It's not disputed that Larry Dixon said what he said, although we think in context it's not so bad as we explained in our brief. However, those were made 10 to 15 years before this law was passed, and he wasn't in the legislature when the law was passed. We think— Can you tell me an example where a judge, a district judge, has decided this kind of issue at summary judgment other than, for example, when there's a facial challenge, when a decision regarding intent and effect have to be decided? Can you give me another example of a case where it's been decided at summary judgment? I'm not able to now, Judge. I've been focusing so much just on these photo ID laws, and it's true that most of those have been decided after a bench trial. We do, of course— That is the best procedure, right? Not when we're entitled to it under Rule 56. We think the best procedure is if there's no dispute of fact and we're entitled to a judgment of law that we get it. But on this intent claim, Judge, we do think that Judge Cooter was correct when he found that the law had no discriminatory impact and therefore there was no need to weigh the evidence. But if this court disagrees, if this court thinks that the— You mean no need to weigh the evidence on intent. That is what I mean, Judge, that there's no need to consider how Scott Beeson fits into this because what the legislature did did not, in fact, discriminate. The judge seemed to accept a number of representations from the secretary, did he not, about the availability of mobile service, the secretary's statement that no one is ever going to be denied a voter ID. The judge has accepted those statements, right? He was required to by Rule 56 because there wasn't evidence that those statements were false. He said, yes, the mobile unit is available, but it is. There's no evidence that it's not available. But, I mean, there was some evidence in the record, is there not, that the availability of the mobile unit, absent some intervention by other government officials or the secretary himself, I mean, aren't those things that would affect the credibility of the secretary's statements for which a trial, having the secretary testify, allowing cross-examination, isn't that the best practice as it would be in any other case? There may be some advantage to that, Judge, but if plaintiffs do not meet their burden under Rule 56 that says, here's evidence that shows that what Secretary Merrill says is false, then there's a dispute of fact, then we have to have a trial. Without that, they don't meet their burden by saying, you shouldn't believe them, they're Alabama. They don't meet their burden by saying, you shouldn't give them credit for that, not without them presenting evidence that contradicts it. Therefore, we think that the district court, and with respect, this court, is obligated to consider and accept the evidence that we presented that's not disputed. Oh, on the intent claim. If this court decides that the evidence of the different rates of possession is enough that you should go through and look at the evidence regarding intent that's been presented, we still think we're entitled to summary judgment. The summary judgment standard is not that there just be some dispute somewhere of fact. It's got to be a genuine dispute. It's got to be, as the Supreme Court said in Anderson v. Liberty Lobby, it's similar to the directed verdict standard. Is there sufficient evidence or, excuse me, is there sufficient disagreement to require a trial, or is it so one-sided that one party wins as a matter of law? So we would ask this court to look at two things. Look at the context in which Alabama passed this law and look at what we actually did. The context is that Alabama didn't invent photo ID laws. There are 34 states now with some type of voter identification laws and 17 or half of them require photo IDs. I'm sorry, referring to context, as I understand it, there's really no evidence of in-person voter fraud in Alabama. Is that correct? There's evidence of two cases, yes. In the history of the state, two cases? That's correct. And there's conversely a fair amount of evidence of absentee ballot fraud. Doodles. So why did the state create an elaborate system to tackle a problem that didn't exist regarding in-person voting? Well, it does exist, even if it's rare. And the Supreme Court has held as a matter of law that states can have photo ID laws to address this. This is legitimate interest in deterring. Indiana had evidence of no cases of in-person fraud. We've at least got some. But the Supreme Court noted that the states don't have to have that kind of evidence in order to have a photo ID law, in order for that to be a valid interest. And they held as a matter of law that photo ID laws further that interest, along with other interests, including increasing voter confidence and in having efficient election administration. Why would the public have less confidence in the in-person voting system if there had been two instances of in-person voting fraud in the entire history of the state? They have confidence, more confidence in elections because they have more confidence that the people who are voting are, in fact, the people who are on the rolls and the people who are counting one ballot. And you're right, Judge. The evidence of voter fraud is far greater in the area of absentee voting. Our law applies to absentee voting. This is an area where North Carolina and Texas both got in trouble. They said, the reason you passed the law, we're not sure that we believe it's because of fraud because you didn't even address absentee voting and that's where the fraud is. Well, we did apply our law to absentee voting. Absentee voters are required to include a copy of their photo ID. I was discussing the context in which we passed the law. But those good points, well, those points that you just made, shouldn't they have been heard by the judge through testimony at trial? Wouldn't that be the best way to do that? No, Judge. I don't think we need a trial to know if Judge Cougar can overrule Justice Stevens on whether or not these are valid state interests. We think that's settled. We think it's settled and we also, it's not disputed that these instances of absentee voter fraud have existed in Alabama, including after we passed our 2003 law. Context in which we passed our law was lots of other states passing photo ID laws. You had the Supreme Court addressing Indiana's law and you had this court addressing Georgia's law and blessing both, sending the message to states that these are okay, these are something states can do. You had the bipartisan Baker-Carter Commission encouraging states to pass photo ID laws for all of these reasons. You had citizen groups who were fed up with the fraud in their areas of the state and they were lobbying for the law, coming together biracially, lobbying for the law, trying to educate the public on the dangers of voter fraud and why we need photo ID laws. And it was them and not Scott Beeson who was invited to the signing of the law. That's why the legislature passed this law. Now consider what the legislature did. We didn't just stop with driver's licenses. The legislature said all of these different categories of IDs you can use, including some that are disproportionately held by minority voters. How easy we made it to get an ID. And when you consider that and you weigh it against the various unrelated items that plaintiffs point to, we believe we're entitled to summary judgment on the intent claim as well as the Section 2 claim. If there are no further questions. There are none. Thank you. Thank you, Your Honor. Mr. Ross, five minutes. Yes, Your Honor. I think it's important to note that no one can request a home visit if they don't know about it. And plaintiffs presented evidence that the Secretary of State had cut advertising, his advertising budget by a third. They presented evidence that both GBM. Did you present any evidence that there was someone who would have requested it had they known about it, but they did not know about it? Your Honor, one of the plaintiffs was only heard about the home visit. I believe that all of the plaintiffs only heard about the home visits after litigation. There's testimony from members of the legislature, from GBM and the NAACP, that they weren't aware of these home visits. By litigation, you're not talking about after the case was over. But didn't the only plaintiff without photo ID get a visit from the van and say, here, we're here to take your photo. We're from the State Government and we're here to help you. Your Honor, someone shouldn't have to file a lawsuit. I know, but isn't that true? It is true, Your Honor. But it's also true that GBM and the NAACP had asked the Secretary of State to send mobile units to places like public housing residents, where they're disproportionately poor African Americans. Public housing ID is not acceptable for voting. The Secretary denied that. There's evidence that Ms. Castafany attempted to go to a mobile unit and get ID. She was unable to. There's evidence of some of the provisional ballot voters who attempted to vote with a provisional ballot and weren't able to. So all of those issues were in dispute. It's in dispute whether or not – and we think that the issue of whether or not people – By evidence that they attempted to vote provisional ballot, you mean they weren't allowed to cast a provisional ballot or they didn't cure it within three days? There is some evidence in the record that poll workers were not telling voters about provisional ballots. There's also evidence in the record of voters who went, attempted to vote provisional ballots. A volunteer from GBM had to help voters tell them about – that they could vote provisional ballot. Some of those people were ultimately unable to vote. So that's a contested issue. But why were they unable to vote provisional ballots? The record – I'm sorry. Let me be clear. There are people who voted provisional – there's evidence in the record that some poll workers were not telling voters about the provisional ballot process. There's also evidence in the record that some voters did vote provisional ballot process, but for the issue that Judge Branch raised, that because of the short time period, they weren't able to get acceptable ID. And again, we think that's evidence that there are people who were prevented from voting. And they didn't cure the ballots? They were unable to cure the ballots. One thing, and I'm not sure how this figures into material or not material, but if I had cast a provisional ballot and had gone to the trouble of doing that, and I watched the election results that night or heard about them the next morning, and it wasn't within one vote, why would I want to go down and cure my provisional ballot? Well, I think, Your Honor, it's important to remember this case is up on summary judgment. They make the argument that people didn't know about it. We presented evidence – or, excuse me, that maybe people just didn't decide to vote. There's no evidence in the record of that. I'm talking about the cure problem. To the extent there is – to the extent that there ought to be more days for cure, and obviously the reason there are not more is they don't want to hold up the tabulation, but does the shortness of the time for cure really – I can't imagine somebody wanting to go, who didn't have a photo ID, wanting to go down and cure a ballot in a race that wasn't decided by a vote. Well, Your Honor, I think people have the right to vote, and they went through the trouble to attempt to vote, and there's evidence in the record that there were people who cast provisional ballots who didn't have photo ID and had difficulty voting. There's no evidence in the record that people – And who would have cured had there been a longer period for cure? Who would have cured if they didn't face the burdens of African Americans and Latino voters being further away from ID and issuing offices, not having access to vehicles, being poor, all those issues that Black and Latino voters face. These are the voters who testified. And again, because it's on summary judgment, we think that inference of what happened with these provisional ballots goes to the plaintiffs. I think it's also important to note that there was statistical evidence about Black voter turnout in Alabama. Dr. Heinel's report at 272-8, I believe, presented evidence that African American voter turnout was down in Alabama. He controlled for things like he compared Alabama to other states, including South Carolina. Is that 2012 and 2016? What was that? Was that the 2012 fall-off and 2016? He did a statistical analysis between 2012 and 2016, 2010 and 2014. Yeah, you know facially what the problem is in the 2012 to 2016 fall-off. Well, I think, Your Honor, the issue, again, is why not – I take that as a yes, obvious reason, but he controlled for that. He controlled for that, yes, Your Honor. He controlled for all those issues. It would have to be a big control, wouldn't it, Counsel? No, Your Honor, because he also compared it to other southern states that are similar, including South Carolina, which is very similar, except for South Carolina has a more lenient photo ID law. And so he attempted to control for that and to address those kind of concerns that you seem to be alluding to, like the Obama effect. That was your conclusion, not mine. I'm sorry, Your Honor. I was talking about the different weather. I think one other, and just on both the provisional ballot issue and the voter, the statistical evidence from Dr. Heinl about turnout, that's evidence that the district court didn't even consider. It's evidence that we think, you know, if he said there was no evidence that voters were prevented from voting, there is, in fact, evidence in the record that voters were prevented from voting. There's evidence in the record that voters were unable to, excuse me, that it had an impact on turnout. And, Your Honor, I see that I've gone over time. If I could just make one more point, which is that there was a question from Judge Gales about whether or not, you know, this case was appropriate for summary judgment. As this court said in Fayette County, summary judgment is inappropriate for Section 2 cases because they're fact intensive, and no other Section 2 photo ID case was dismissed as summary judgment. You can't say in any category of cases that summary judgment is never appropriate in this category of cases. No. Because we can't override Rule 56, and you never know what's going to be a material, genuine issue of material fact in a particular case. Yes, Your Honor, and I think what we're saying here is that the Secretary of State presented evidence that there are these mobile units and home visits. We presented substantial evidence that those visits were ineffective, that they were not widely advertised, and that they, and we think that that creates a factual dispute. Thank you, Your Honor. Thank you. I appreciate it. That case was well argued on both sides. We'll take a break here and let everybody get ready for the insurance.